## SCHOOL DIST. NO. 7, CREEK CO., v. BOARD of COM'RS, CREEK CO.

No. 18373.    Opinion Filed Feb. 7, 1928.

On Petition for Rehearing Dec. 4, 1928.

Application to File 2nd Petition for Rehearing Denied March 12, 1929.

Wallace & Wallace, for plaintiff in error.

W. F. Pardoe, Co. Atty., and Grady Lewis, Asst. Co. Atty., for defendant in error.

HEFNER, J.   School district No. 7 in Creek county, as plaintiff, sued the board of county commissioners of Creek county, as defendant, to recover state aid money alleged to be due the district school by reason of the fact that such funds had been paid by the state to the county treasurer, and because the county treasurer had never turned said funds over to the school district. The funds involved are known as state aid and county aid and gross production tax. It is admitted that the plaintiff has received the per capita amount due the district based on the population of the majority scholastics therein. The amount sued for represents the per capita amount based upon the minority or separate school scholastics residing in the district. The trial court entered judgment for the plaintiff except as to the portion of the funds it held was barred by the statute of limitations.

The plaintiff is what is commonly known as a "common" school district as distinguished from an "independent" school district. The plaintiff contends that all moneys apportioned to the county treasurer coming from state and county aid and from gross production tax are for the use and benefit of the white or majority schools; and that the county must maintain the school for the negroes or separate school. as the case may be. by an ad valorem tax levied against all taxable property in the county; and that all state aid money. including the gross production tax. must be paid to the district

school, and that the county must produce in cash by an ad valorem tax the full amount of the approved budget to take care of the separate school. In other words, plaintiff contends it has a right to appropriate the state aid money coming into the hands of the county treasurer based upon the scholastic population of the separate school.

The board of county commissioners contends that the moneys received for a separate school from the state aid and gross production tax are for the use and benefit of the separate school; and that the funds so received for the use of the separate school, based on the number of separate school scholastics, is to be used to defray the expenses of the maintenance of a school for that separate district and that the funds are to be deducted from the amount of moneys necessary for the maintenance of said separate school at the time of making the levy for the maintenance by an ad valorem tax.

Both the plaintiff and defendant refer to the case of Board of County Commissioners v. School District No. 19, Carter County, 119 Okla. 20, 248 Pac. 324. In that case it was said:

"The separate school provided for by law is as much a part of the common school system of the state as the majority school, and it may be a white school as well as a negro school (section 10569, C. O. S. 1921; Railway Co. v. Lane, 69 Okla. 145, 170 Pac. 502), and while there is a different method in assessing and collecting ad valorem taxes for the maintenance of the separate from the majority school, there is no provision of the statutes to indicate any difference in their relation to, or right in, the gross production tax."

This clearly and correctly holds that the separate school is as much a part of the common school system of the state as is the majority school, and that the separate school is entitled to its proportionate share in the gross production tax fund.

It is true that in the Carter County Case the county treasurer was required to pay over to the treasurer of the school district all of the gross production tax received by him, including the amount that was held by him derived from the scholastics of the separate school. This was a correct holding because school district No. 19 composes the City of Ardmore and is an independent district and the law relating to the separate school in an "independent" district is altogether different from that relating to a separate school in a "common" school district.

The officers of a district school board consist of a director, a clerk, and a member. The officers of a board of education of an independent district consist of a president, vice-president, clerk, and a treasurer. (See sections 10351, 10409, and 10413, C. O. S. 1921).

In an independent school district the board of education has the power to prescribe rules and regulations for the government of both the independent and the separate school. It elects the teachers for both schools. It makes the estimate for the support and maintenance of both schools. Not only is this true, but when the taxes are levied and collected for the support and maintenance of the separate school, it is the duty of the county treasurer to pay the same into the hands of the treasurer of the independent district. (See section 10574, C .O. S. 1921.)

In a common school district the district board does not have the power to prescribe rules and regulations for the government of the separate or minority school. It does not elect the teachers in the separate school. It does not receive nor disburse the funds of the separate school. In fact, it has no authority whatsoever over the separate school. In the common school district the estimate for the maintenance of the separate school is made by the county commissioners. The county superintendent prescribes the rules and regulations for the government of the separate school. All orders or warrants for the expense of such school are issued upon the county treasurer by the county clerk and countersigned by the county superintendent. (See section 10579, et seq., C. O. S. 1921.)

It is the duty of the county treasurer to receive all funds for the support and maintenance of the separate school in a common school district and hold the same for the benefit of the separate school in such district and disburse the same upon the warrants drawn by the county clerk upon the county treasurer and countersigned by the county superintendent.

The contentions herein by the plaintiff have been recently decided against it in the case of Board of Education of City of Sapulpa v. Board of Commissioners of Creek County, 127 Okla. 132, 260 Pac. 22. In this case, Mr. Justice Riley, speaking for the court, said:

"We hold, therefore, that not only are the separate scholastic enumerations to be considered in the apportionment of funds derived from the common school fund as aid, but such separate schools are entitled to equal benefit in the expenditure of such funds by reason of section 3, art. 11, of the Constitution, and section 10493, C. O. S. 1921, et seq., providing for the enumeration of all

school children in the state, including both negroes and whites, sections 10236, 10237, C. O. S. 1921, providing for the apportionment of the state common school fund to various counties, and section 10315, C. O. S. 1921, providing for the apportionment of the common school fund to various school districts."

This case clearly holds that the separate schools are entitled to the equal benefit of the expenditures of the state aid known as the gross production tax fund. It must therefore follow that the moneys received for a separate school from state aid and gross production tax are for the use and benefit of the separate school; and that the funds so received for the separate school, based on the number of separate school scholastics, is to be used to defray the expenses of the maintenance of a school for that separate district; and that the funds are to be deducted from the amount of money necessary for the maintenance of said separate school at the time of making the levy for the maintenance by an ad valorem tax.

Under the Constitution, the statutes, and the cases construing them, we think the law may be summarized as follows:

Separate schools for white and colored children with like accommodations shall be provided by the Legislature and impartially maintained. The separate school provided for is as much a part of the common school system of the state as the majority school, and it may be a white school as well as a colored school. The one has as much right in and to the state aid fund provided for by the Constitution and the statutes as the other. Funds created and set apart for the support and maintenance of the one cannot be expended and used for the support and maintenance of the other.

The separate school in an independent school district is under the management and control of the board of education of the independent school district and, under the statute, all funds collected by the county treasurer for the support and maintenance of the separate school, when collected, must be paid into the treasury of the independent school district.

In common school district the district board has neither authority nor control over the separate school. It neither employs teachers nor disburses the funds of the separate school. The estimate for the maintenance and support of such separate school is made by the county commissioners. The county superintendent employs the teachers and prescribes the rules and regulations for the separate school. The funds are dis-bursed by warrants drawn by the county clerk on the county treasurer and counter-signed by the county superintendent.

The plaintiff has neither authority nor control over the separate school in district No. 7. There is no statute that authorizes it to receive or disburse the funds belonging to the separate school. All this authority was by the Legislature placed in other hands. It therefore follows that it is not entitled to recover the funds sued for. Taking this view of the case, it is not necessary to determine whether or not the statute of limitations is applicable.

The judgment of the trial court is reversed, with instructions to enter judgment for the defendant.

MASON, V. C. J., and LESTER, HUNT, CLARK, and RILEY, JJ., concur.

PHELPS, J., dissents.

---

## On Rehearing.

LESTER, J. In addition to the expression of law as contained in the original opinion, the plaintiff cannot recover judgment for another reason. It must be remembered that we are dealing with that portion of the state money which is devoted to the support and maintenance of the common school system of this state.

In administering and distributing said funds the state has adopted certain agencies through whom it acts.

Constitution, article 13, section 1, of the state of Oklahoma, devolves the duty of establishing and maintaining public free schools upon the Legislature.

Constitution, article 11, sections 2 and 3, creates the funds for such schools, establishing the permanent school fund; provides that the income from such fund shall be used for the maintenance of the common schools in the state; and provides that the principal shall create a trust fund held by the state.

Constitution, article 13, section 5, provides for a Board of Education of the state, also provides that the supervision of the public schools shall be vested in this board, and that the Superintendent of Public Instruction shall be president of the board, and also provides that the powers and duties of this board shall be prescribed by law.

Section 10236. C. O. S. 1921. provides for monthly apportionment of the income accruing from the permanent school fund and the ad valorem taxes collected by the state.

from which proper reports have been received by the Superintendent of Public Instruction.

Section 10237, C. O. S. 1921, provides the basis of apportionment, as follows:

"The apportionment to each county shall be made in proportion to the number of children over the age of six years and under the age of 21 years, resident therein, as shown by the last annual report of the county superintendent to the State Superintendent. The Commissioners of the Land Office, in distributing all funds mentioned in this section, shall draw their order on the State Treasurer or other officer having custody of such funds, in favor of the county treasurers of the counties respectively entitled to school moneys, for the amount of such moneys apportioned to his county, and certify the amount of such order to the State Treasurer, and also to the county clerk and superintendent of the proper county."

Section 10315, C. O. S. 1921, provides:

"Within five days after receiving the certificate of the State Superintendent of Public Instruction informing him of the amount of state school fund which has been apportioned to his county, such county superintendent shall apportion the same, together with the unapportioned county school fund in the county treasury, among the school districts and parts of districts in such county in the ratio of the number of persons of school age who are entitled to receive the same, residing in each district, or part of district, as shown by the last annual report of the several clerks of such district and parts of districts."

In the case of Board of Ed. of City of Ardmore v. State ex rel. Best, 26 Okla. 366, 109 Pac. 563, it is said:

"The free public school system which the Legislature is directed to establish by article 13 of the Constitution is a matter of general state concern and not a municipal affair."

To the same effect, State ex rel. Friend v. Cummings et al., 47 Okla. 44, 147 Pac. 161. The funds sought to be recovered under the plaintiff's petition are part of the common school funds, which were never apportioned to the plaintiff school district by the county superintendent of schools.

The case of Gridley School District of Butte County v. Stout et al. (Cal.) 66 Pac. 785, is a case wherein the school district brought suit against the county superintendent of schools to recover certain unexpended balances to the credit of the school district, which were turned over by the superintendent of schools to the unappropriated school fund of the county. The syllabus of this case is as follows:

"1. A school district cannot sue the superintendent of schools of the county on the ground that he turned over an unexpended balance to the credit of the school district to the unappropriated school fund of the county, as plaintiff has no proprietary right to the money to its credit in the treasury.

"2. A county school superintendent erroneously turning over the unexpended balance to the credit of a school district to the unappropriated school funds of the county is not liable to the school district in an action for tort."

And in the body of the opinion it is said:

"It is clear that the action cannot be maintained. The plaintiff had no proprietary right to the money to its credit in the county treasury, and therefore, no right to recover it."

In the case of Kennedy, City Treasurer, v. Miller, County Treasurer, et al. (Cal.) 32 Pac. 558, the city treasurer of the city of San Diego brought suit against the county treasurer and county auditor of San Diego county to obtain custody of funds apportioned for school purposes. In this case it is held, quoting from the syllabus of the case:

"That all moneys apportioned from the school fund, as well as those raised by a levy on the taxable property of a city, are to remain in the county treasury until withdrawn under requisition of the county superintendent, and are not subject to call by the city for deposit in the city treasury."

Quoting from the body of the opinion, the court, speaking with reference to the ownership of funds which have been apportioned to the county and by the county superintendent to be apportioned among the several school districts of the county, says:

"The school moneys never lose their character of public moneys belonging to the state, and are to remain under the control of its officers for the purposes for which they have been appropriated. The fact that they have been apportioned to the several school districts does not give to those districts any proprietary right therein, or any right to their custody; but the districts through their authorized agents have the right merely to contract for their proper disbursement within the purposes authorized by law."

In the case of Cooke, County Superintendent of Schools, v. School District No. 12 (Colo.) 21 Pac. 496, it is held that the school district has no interest in the school fund until such time at least as the fund is apportioned and credited to the respective school districts.

The case of Webb County v. Board of School Trustees of Laredo (Tex.) 65 S. W. 878, decided by the Supreme Court of that state, involved certain school funds which had been received from the state by Webb county, no part of which had been paid to the school district.

Article 3934 of the Revised Statutes of Texas, 1895, provides as follows:

'The county superintendent, upon the receipt of the certificate issued by the board of education for the state fund belonging to his county, shall apportion the same to the several school districts (not including the independent school districts of the county), making a pro rata distribution as per the scholastic census, and shall at the same time apportion the income arising from the county school funds to all the school districts, including the independent school districts of the county, making a pro rata distribution as per scholastic census.'

In article 3935 of the Revised Statutes of Texas, it is provided that:

"* * * The treasurers of the several counties shall be treasurers of the available public free school fund, and also of the permanent county school fund for their respective counties."

The court in that case said:

"It is expressly made the duty of the county superintendent, whenever there is one, to make the apportionment among the school districts and communities of the county. In the performance of that duty, he is not subject to the control of the commissioners' court; on the contrary, his administration of 'all matters pertaining to public education in his county' is expressly made subject to 'the direction of the State Superintendent.' In the case of White v. City of San Antonio (Tex. Sup.) 60 S. W. 426, notwithstanding the hardship of the result, we held that the city was not liable for the conduct of its health officer in making a pesthouse of the plaintiff's hotel,—for the reason that the functions the officer was called upon to perform were in the interest of the public at large, and not for the special interest of the city, and that therefore he was acting for the state and not for the city. For a stronger reason we must hold that a county cannot be held responsible for the failure of the county superintendent to make a proper apportionment of the available school fund of the county. Though, in a sense, a county officer, and though called 'county superintendent,' he is, in fact, the officer and agent of the state, —the state having assumed the functions of maintaining public free schools for the education of the children throughout its domain, the counties being recognized with reference to that business merely as convenient sub-

divisions of territory, and some of their officers as proper agents for the administration of affairs relating to the public free schools. Such officers, with respect to such affairs, act for the state, and not for the county. This is the case, even as to officers, who, in other respects, are county officers in fact as well as in name. White v. City of San Antonio, supra; Johnson v. Hanscom, 90 Tex. 321, 38 S. W. 761. The complaint here is that there was a failure to properly apportion the special available school fund of Webb county for certain years mentioned in the petition, whereby the independent school district of the city of Laredo received no part of such fund during such years. Since the apportionment was a function assumed by the state, to be discharged by an officer acting for it, we are of the opinion that the county cannot be held liable for his action."

It is alleged in the plaintiff's petition in the instant case:

"That the said county superintendent of public instruction and the county treasurer of Creek county erroneously apportioned and paid a large portion of said county and state aids; that for the years 1916 to 1925, inclusive, in said apportionment, said officers in computing the apportionment of said county and state aids to school district No. 7, failed and neglected to include the minority scholastics, to wit, minority scholastics, male and female, between the ages of six and 21 years, residing in said district, in the computation of the apportionment of said county and state school aids to said school district No. 7.

"That the said sum of $3,456.99, so erroneously apportioned by the county superintendent of public instruction and the county treasurer of Creek county, was, and is, the property of school district No. 7; and the plaintiff, by reason of the duty imposed upon it by law, was, and is, entitled to same, together with interest thereon, at the rate of six per cent. per annum from the date of the several erroneous apportionments above referred to, in the total sum of $1,-132.92."

Under the allegations of plaintiff's petition, if the state agencies acted erroneously, such acts will not enable plaintiff school district to recover a money judgment against the county.

---

BRANSON, C. J. (dissenting on rehearing.) The writer dissents to the opinion rendered herein. It subverts the common school law of the state, and its well-devised system for the separate common school education of whites and colored in Oklahoma.

The opinion confuses the right of individuals within school age to participate in

the state aid to schools, and the ownership of such state aid funds by municipal corporate subdivisions for use as by law directed. It can be justified only on the theory that each child owns the money. The statutes in aid thereof adhere to the constitutional provisions, which make the school district the entity, and require the Legislature to provide a system of complete separation of whites and colored for school purposes. This idea in the Constitution is not original to the state, but was in the law of Oklahoma Territory when the Constitution was drafted, and had been from 1890, down to statehood date, November 16, 1907. On the last-named date such statutes were in full force and effect, and school districts were already in existence, the continuation of which as theretofore, until changed, was recognized by the Constitution of the state. The authority for the formation and change, by the superintendent, of the districts is now found in section 10321, C. O. S. 1921. Section 10337, C. O. S. 1921, makes each school district, so formed as theretofore provided, a corporate entity, capable of suing and being sued, of owning and selling properties through its proper elected officers.

The opinion as written does not point out the provisions of the Constitution and School Code made thereunder which the writer believes to be determinative of the issue here. From time to time, the territorial system of separate schools was modified by legislative enactment. It was a district system and a county system. It so existed when the Constitution of the state was drafted, as aforesaid. It was a district system, in that districts were formed as aforesaid, and in that the majority school, whether white or colored, was the district school and district burden. It was a county system as to the minority school, whether white or colored, and a county burden. Burden here is used in the sense of the municipality required to raise the money incident to all the conveniences and expenses of the respective schools.

Finding this system in effect, and conscious that the state received certain funds for the use of public education, it was provided by section 3, art. 11, of the Constitution (Williams Ann. Const., sec. 298):

"The interest and income of the permanent school fund, the net income from the leasing of public lands which have been or may be granted by the United States to the state for the use and benefit of the common schools, together with any revenues derived from taxes authorized to be levied for such purposes, and any other sums which may be added thereto by law, shall be used and applied each year for the benefit of the common schools of the state, and shall be, for this purpose, apportioned among and between all the several common school districts of the state in proportion to the school population of the several districts, and no part of the fund shall ever be diverted from this purpose, or used for any other purpose than the support and maintenance of common schools for the equal benefit of all the people of the state."

Let us repeat: "And shall be, for this purpose, apportioned among and between all the several common school districts of the state, in proportion to the school population of the several districts. * * *" The territorial statute carried forward into statehood, had already provided how the school districts were organized, and that they were political entities or bodies corporate, capable of suing and being sued, of owning and disposing of property. It is clear, therefore, that what is referred to in this case as the state aid (that is, money coming from the state) must be, under said section, distributed to the school districts, and it was the property of the school district as such, and herein lies the basic error in the opinion of the court, which proceeds upon the erroneous assumption that each individual child within school age is entitled to participate in the money. Certainly ultimately or remotely, or we might say, in the last analysis, the money is for the benefit of all people of the state, but just how it is to be used for the benefit of all the people of the state was a matter for the Legislature to carry into effect, if the statutes already in existence at statehood were not deemed sufficient or needed changing at any time. The school law was merged, in 1913, into a Code (chapter 219, Session Laws of 1913). The Code as there found has only been modified in minor particulars since that time, and that only as to independent school districts authorized by the said Code to be created in cities. It is wholly impracticable to review all of the sections of this School Code. The said chapter 219, Session Laws 1913, had an express repealing clause. The system found therein is the territorial system, which the state inherited, with certain changes and modifications. Our constitutional provisions were adopted, and could have had no other purpose than to continue the system of separate education for whites and colored which the makers of the Constitution found existed in Oklahoma Territory.

School districts were matters of county organization, in that they were formed by

county officers, under legislative authority. Counties were organizations under constitutional authority. The fund referred to in section 3, art. 11, supra, being required to go to school districts, it was a legislative question as to how it should first reach the counties, and how much should go to each county. To this end, an enumeration of the scholastics of each county was required to be made, upon blanks furnished by the State Superintendent to the county superintendent, and in turn to the school districts. Compiled Oklahoma Statutes 1921, sec. 10493, gives the form of such blank, and it is required to show the race (whether white, negro, or Indian) and whether deaf, dumb, or blind, C. O. S. 1921, section 10495, requires that the persons enumerated shall be bona fide residents of the districts as of January 15th, who are over the age of six, or will reach such age on or before September following, and under the age of 21 years. When the enumeration, as required, is made, it is returned under oath to the county superintendent, who in turn advises the State Superintendent of the scholastics in each county (whites, Indians, negroes, deaf, dumb, and blind). The **scholastics** were the sum total of all persons, whether white, Indian, or negro, deaf, dumb, or blind, who were within the ages mentioned in the statute. Adverting to the primary purpose of this enumeration, we quote section 10237, C. O. S. 1921:

"The apportionment (meaning the apportionment of the funds referred to in section 3, art. 11) to each county, shall be made in **proportion to the number of children over** the age of six years, and under the age of 21 years resident therein as shown by the last annual report of the county superintendent to the State Superintendent. The Commissioners of the Land Office, in distributing all funds mentioned in this section, shall draw their order on the State Treasurer or other officer having custody of such funds, in favor of the county treasurers of the respective counties thereto, for the amount of such moneys apportioned to his county, and certify the amount of such order to the State Treasurer, and also to the county clerk and superintendent of the proper county."

The moneys are thus placed in the hands of the county treasurer, apportioned according to all persons within school age (irrespective of race or color, deaf, dumb, or blind), and the county treasurer so receives them as an agency of the state. **The question then arises, what is the duty of the county treasurer as to such money?** He has received it for the benefit of the school districts of his county. These districts are political corporations. He holds it for **their** benefit. How much goes to each district? The answer is found in section 10315, C. O. S. 1921, which provides that after the State Superintendent has informed the county superintendent as to the amount of money coming to his county, "Such county superintendent shall apportion the same, together with the unapportioned sum in the county treasury, among the school districts and parts of districts in such county, in the ratio of the number of persons of school age who are entitled to receive the same, residing in each district or part of district, as shown by the last annual report. * * *" (These are the scholastics.) Pause: The argument is made that the words "children entitled to receive the same" mean ownership in the individual children. Such an idea is a complete innovation in the proprietorship of public moneys. The language is another and shorter, though inept, way of expressing the children within school age, as so many thus mentioned in the statutes.

Again we must pause, and note that this so-called state aid goes to the counties according to the entire scholastic population of the county within school age. It goes to the districts by the same phraseology, according to the entire scholastic population of the district. The language of the law as to the amount the county treasurer gets from the state, and as to the amount the school district gets, to wit, in proportion to all persons within school age, is identical, if not in exact language, certainly by unmistakable intendment. So if the county treasurer is entitled to receive from the state the state aid on the basis of whites, colored, Indians, deaf, dumb, and blind, who cannot attend such schools, in the ratio of persons of school age within the county, the school district must receive its ratio of the entire sum, according to all persons within school age residing in the district. (The money is the property of the district.) This is done by the county superintendent certifying to the county treasurer the number of persons in each school district within school age. It is thereupon the duty of the county treasurer (made by statute the treasurer of each school district, except independent districts), as the treasurer or custodian of the funds of each school district, to place said amount to the credit of the school districts, upon the records of his office, or, in other words, he receives from the state the money as the agency of the state; when he receives the certificate from the county superintendent as to the number of scholastics within each school district, the

law requires him to put to the credit of that district, as its treasurer or custodian, the funds belonging to that district, and subject to the order of the officers of that district, the amount of each district, according as the ratio of scholastics in that district bears to the entire scholastics of the county. So we see this money belongs to political subdivisions known as school districts, and not to individuals.

The school district officers are either white or colored, according to the majority of scholastics within the district. (This, with certain discretion in the county superintendent, provided in the statute.) If the whites are in the majority, the white school is the majority school, and the district school. If the colored are in the majority, the district school is (subject to the exception in the statute) the colored school. The other, if there be another in the territorial limits of the district, is the minority school. The moneys belonging to the school districts are used by the district school, whether it be colored or white. The minority school is an **adjunct of the county government**, as distinguished from school district government, and all the burdens incident to the maintenance of the minority school are the burdens of the county as a political entity of government. Taxes for minority schools are levied on **all** of the property of the county to support such schools.

It is not amiss here, on account of the extreme importance of the matter involved, to call attention to what must have been the potent and moving cause of the evolution of this system from territorial days through the Constitution and Legislatures of the state. School districts are small subdivisions. Hundreds of them exist in isolated parts of counties, where there is little property subject to taxation. No wealth such as in cities, which may be in the same county. Districts can levy taxes only upon the property located therein. The separation of the races for educational purposes is a governmental policy, and necessitated a system to carry it into effect, and it was and has been continuously deemed expedient that **all of the taxable property of the county** should bear its ratio of burden for the maintenance of such minority schools, whether white or colored. An illustration is not inapropos. A school district has 125 white children within school age, 100 colored within school age, a total of 225 children within school age. Under the law, as above pointed out, the **school district** is entitled to state aid money on a basis of 225

scholastics. The whites, being the majority, elect the school board, and their school is the district school, and all of the money going to the district is used for that school. This does not mean, however, that the 100 colored children shall not have equal facilities, and be equally provided for, both as to building and as to teachers. In fact to that end all the property of the county is subject to a tax. But the school for the colored children is maintained by the county. The board of county commissioners see that a sufficient tax levy is made through the excise board to maintain it. The board of county commissioners are required to provide for the erection of the buildings. The moneys for the support of the separate school are county moneys or funds.

The constitutional provisions and School Code (Session Laws 1913, chapter 219) constitute a too plain and potent plan to meet the destruction which the instant opinion deals the system so inaugurated, and that without reference to the numerous opinions of this court holding as the writer hereof views the law. Hundreds of school districts in the state cannot function with the wreckage this opinion deals them. Not only is this true, but the opinion, without referring to them, overrules numerous decisions of this court sustaining the system as hereinabove outlined, in language the intent of which is unmistakable. (It is also contrary to the interpretation placed thereon by the school department under the advice of the Attorney General. This is not in the record, however.) In support of this last statement, we should examine a few of the cases, as well as the statutes themselves.

In the case of Going, Co. Treas., v. A., T. & S. F. Ry. Co., 88 Okla. 283, 213 Pac., page 84, the principle involved in this case was there decided adverse to the holding in the opinion of the court herein. The plaintiff sued the county treasurer for the return of part of a one-mill tax levy, made for the benefit of the common school fund in the county. In making up the budget, estimated income from sources as here, accruing, was not taken into consideration, or deducted from the total amount to be raised by an ad valorem levy. The court denied the plaintiff's contention in an opinion written by Justice Cochran, wherein in part he said:

"Since it is our opinion that the money in the common school fund does not belong to the county, and the income for the benefit of the common school fund from

state apportionment, interest on daily balances, etc., is not an income of the county, these items should not be deducted from the total amount of the apportionment in arriving at the amount to be raised by ad valorem tax for the fiscal year."

The court also said:

"1. Funds in the hands of the county treasurer as a part of the common school funds are not county funds, but belong to the various school districts of the county, and the county treasurer is simply designated by law as the proper agency for receiving the various items going into such fund, and for the disbursement thereof upon the order of the county superintendent."

"3. The various items of income for the common school fund, including the amount to be received from the state apportionment, interest on daily balances, mortgage tax fees, fees from registration of choses in action, marriage license fees, fines and forfeitures, and gross production taxes, are not to be considered items of income of the county, and should not be deducted by the excise board from the total appropriations for the current expenses of the county in determining the amount to be raised by ad valorem tax."

Also:

"Section 5809, C. O. S. 1921, provides that all warrants upon the county treasurer shall be issued upon the order of the board of county commissioners, signed by the chairman thereof, and attested by the county clerk. It seems clear to us from the foregoing provisions that the moneys paid to the county treasurer for the common school fund was never intended by the Legislature to be considered county funds, but, on the contrary, was intended as a fund for the use of the various school districts of the county, and the county treasurer is simply designated by law as the proper agency for receiving the various items going into the common school fund, and shall disburse the same upon the order of the county superintendent without any action on the part of the county commissioners whatever."

In the case of Board of Com'rs of Carter County v. School District No. 19, 119 Okla. 20, 248 Pac. 324, this court held contrary to the opinion in the instant case. In that case, the independent school district No. 19 sued the county for money turned into the general fund by the county treasurer and which was state aid funds, and which should have been turned over to the plaintiff school district, and which fund was received by the county treasurer as the state apportionment, according to the scholastics, of the said independent school district. The court said:

"The school population of the county under the law of the state consists of all persons of school age, whether of the white or negro race.

"Under section 9822, C. O. S. 1921, one-sixth of the gross production tax, as therein provided, must be delivered by the State Auditor to the county treasurer, to be credited to the common school fund of the county in proportion to the school population of such county; that is, the credit shall be entered showing the amount each one of school age is entitled to by an equal division of such fund; and under section 10315, C. O. S. 1921, the county superintendent of public instruction is charged with the duty of apportioning this fund among the school districts and parts of districts in the county; and, when this is done, it is the duty of the county treasurer to turn over to each treasurer of the respective independent school districts, subject to the use of the board of education of such district, the full amount so apportioned, and it is no defense for not so doing that the school or schools of the district had been otherwise financed."

In commenting upon the ownership of such moneys under section 3, art. 11, of the Constitution and the School Code of the state, this court said:

"It (meaning the money—ours) did not belong to the county at the time it was received, and we cannot see how it could belong to the county to take the place of the ad valorem taxes collected from the county to support the separate schools in district 19. There is no law for this exchange, and we do not think there is any construction that would justify this contention."

Following this last-cited case, this court held contrary to the instant opinion in the case of School District No. 68, Bryan Co., v. Board of Com'rs of Bryan County (a suit against the county) 122 Okla. 116, 251 Pac. 1118, in which this court stated that the law announced in the said case of School District No. 19 of Carter County was applicable. This language was used:

"The law applicable to that case is equally applicable to the case at bar, and upon the authority of that case, the judgment of the district court of Bryan county is reversed and the cause remanded with instructions to the trial court to render judgment for the plaintiff."

In both of these last-cited cases, the school districts recovered large judgments against counties for money received by the county treasurer from state aid and diverted to use of the county.

It must be noted that the case of Board of Com'rs of Carter County v. School District No. 19 of Carter County, involved an

independent school district. The case of School District No. 68 of Bryan County was that of a common school district, just as in the instant case. It may be contended that there is a difference between the Carter County and the Bryan County Cases, by reason of one being an independent school district and the other a common school district. There is no difference in principle, for the following reasons: The same act of the Legislature (chapter 219, Session Laws 1913) provided how the common school districts, as well as the independent school districts, should be created. So the authority for the existence of each is in the same act of the same Legislature. There have been some slight amendments as to independent school districts, but none affecting the issue here.

Section 34, art. 5, chapter 219, Session Laws 1913, provides:

"The county treasurer of each county is hereby constituted the custodian of the school district funds of the several districts of his county, except independent districts."

"Section 35. The county treasurer shall keep a correct account of all moneys received for the benefit of and belonging to each of the several districts of his county, the source from which received and the disbursements of the same, as is hereinafter provided and the object for which paid out.

"Section 36. All public funds of any district shall be disbursed, only in the payment of legal warrants or orders, bonds and interest coupons.

"Section 37. **School district funds shall be disbursed by the county treasurer only upon warrants issued by the school district board and for paying interest coupons and bonds legally issued by the school districts.** No warrant shall be issued except on verified claims made under oath, which claims shall be approved by the district board. No claim shall be approved by the district board unless the same shall be made out in separate items and the nature of each item stated. For the purpose of verifying claims school district clerks are hereby given authority to administer oaths."

Other sections of the said chapter provide for the election of officers in common school districts, and they run and control the district, but the said last-quoted sections make the county treasurer the treasurer or custodian of the moneys belonging to each common school district. The treasurer of independent school districts, by reason of section 6 of article 6 of said chapter 219, is elected by the school district itself, and he, as treasurer, is entitled to receive from the county treasurer all funds belonging to the independent district, same to be used on order of the board of education of such district.

So we find that so far as the custodian of the funds for common school and independent school districts is concerned, the Legislature made the county treasurer the treasurer of common school districts, and permitted the election of the treasurer in independent school districts, and directed that the moneys belonging to an independent school district be turned over to the treasurer thereof by the county treasurer after he had received the same, whereas the money received by the county treasurer from state aid, such as is in question in this suit, is by the county treasurer himself required to be placed to credit of each district as treasurer of the common school districts to which such money belongs. And therein is the only difference as to the custodian of the funds of independent and common school districts in Oklahoma. Had the statute directed the common school districts to elect a treasurer, certainly the case would have been analogous. The principle, therefore, announced in said case of School District No. 19 of Carter County is entirely controlling in principle as to a common school district, as announced by this court in the said Bryan County Case. For, as held by this court in the said Carter County Case, if the independent school district was entitled to receive through its treasurer the moneys apportioned to it on the basis of the entire scholastics, including colored as well as whites, a common school district is entitled to receive and have kept by its treasurer, to wit, the county treasurer, all moneys due it, according to its scholastics, including both whites and colored.

In independent districts the minority school is required by the plain, unambiguous language of the statute itself to be maintained by an ad valorem tax levy on all the property of the county, and though the board of education of independent districts have the supervision of such minority schools, they are merely made the agency of the county to file with the board of county commissioners the separate estimates of the needs of the separate schools in such a district, then the board of county commissioners places it in the budget for county purposes, and the excise board makes the levy over the entire county.

The last above proposition is made conclusive by section No. 10574, C. O. S. 1921, as follows:

"In all cases where county separate schools

for white and colored children are maintained, the county excise board shall annually levy a tax roll on all taxable property in their respective counties, sufficient to maintain such separate schools as are hereinafter provided. Upon estimate made by the county commissioners, said taxes shall be estimated, published, levied and collected, in the same manner as other taxes for county purposes; Provided, however, that in all independent districts where separate schools for white and colored children are maintained, it shall be the duty of the board of education therein, at the time of the preparing of their annual budget, to prepare a separate budget of the amount of money that will be required to be raised by taxation for the support and maintenance of such separate schools, including the amount necessary to purchase sites and to erect school buildings for such separate schools for the coming fiscal year, and it shall thereupon be the duty of the county excise boards in such counties to levy a tax on all taxable property in their respective counties sufficient to pay the cost of supporting and maintaining such separate schools and purchasing sites and erecting school buildings for such separate schools as shown by such budget, and which said tax shall be published, levied, and collected in the same manner as other taxes for county purposes, and when collected shall be paid over to the respective treasurers of the board of education in such districts, to be expended upon the order of such board of education for the purpose for which same was levied and collected.

"No white child shall attend a colored school or a colored child attend a white school."

We underscore part of the said statute which makes it clear that separate schools are maintained by an ad valorem tax levy on all the taxable property of the county, and that for separate schools, whether they be located in the territorial limits of a common school district or whether they be located within the territorial limits of an independent school district. The statute further makes it clear that while the estimated needs of the independent district are made up by the board of education of such district, it is submitted to the board of county commissioners, and by such board to the excise board, and a tax on all the taxable property of the county is levied therefor. While the said last-quoted section gives the board of education of the independent district the right to disburse the ad valorem tax levied and collected for separate schools, yet it is unavoidable that the obligation for the maintenance and support of such separate schools, even in independent school districts, is a tax levy on all the taxable

property in the county, and the doing of this is a county obligation or burden, and in no sense the obligation of the independent school district. Some contention is made that the intent and purpose of the enabling act and the Constitution in accepting the terms thereof would prohibit this construction as the law. This is a fallacious contention, for a statute as to the public school land and moneys received by virtue of the act of the national Congress is identical in intendment with a similar act authorizing the admission of the state of Montana into the Union. That question was raised in the case of Haire v. Rice, decided by the Supreme Court of the United States (204 U. S. 291), which was quoted from at length by the Supreme Court of the Territory of Oklahoma in the case of Frantz v. Autrey, 18 Okla. 561, 91 Pac. 193. The opinion of the Supreme Court of the United States in part held:

"The plaintiff in error argues that the grant of all the land by the enabling act was by an ordinance accepted by the state 'upon the terms and conditions therein provided,' that the Legislature of the state was by the last clause of section 17 appointed as agent of the United States, with full power to dispose of the lands in any manner which it deemed fitting, provided only that the lands or their proceeds should be devoted to normal school purposes; and that therefore in the execution of this agency, the Legislature was not and could not be restrained by the provisions of the state Constitution."

Further, in the same case, the Supreme Court said:

"In the same act, the people of the territory about to become a state ware authorized to choose delegates to a convention, charged with the duty of forming a Constitution and state government. It was contemplated by Congress that the convention would create the Legislature, determine its place in the state government, its relations to the other governmental agencies, its methods of procedure, and in accordance with the universal practice of the states, limit its powers."

The court then held that the use of the land so given by the national government to the new state of Montana, in the manner prescribed by the Legislature under constitutional provisions, was equally within the authority of the state. While section 5 of article 1, Oklahoma Constitution, provides for the establishment and maintenance of a system of public schools to be kept open to all the children of the state. free from sectarian control, it also provides that nothing in said provisions shall be construed as

preventing the establishment and maintenance of separate schools for white and colored children, and the code adopted by the Legislature was the carrying out of this constitutional intent in accepting the plan in detail as hereinabove pointed out, as repeatedly held by this court.

In the case of State v. Albritton, 98 Okla. 158, 224 Pac. 511, this court said:

"It is the public policy of this state, and the statutes so provide, that the public schools shall be organized and maintained upon a complete plan of separation between the white and colored races. The teachers of the so-called district schools are elected by the boards of such districts and are paid by the districts. The teachers of the so-called separate schools are appointed by the county superintendents and paid by the counties. The schoolhouses for the district and the separate schools are built and maintained in like manner—the one by taxation levied upon the district, and the other by taxation levied upon the entire county. We cannot presume, in the instant case, that the colored school, designated by said superintendent, as the separate school—to be supported by the county— was not equal in facilities to the white school, designated as the district school to be supported by the district. The guaranty of equal protection of the laws, under said Fourteenth Amendment, operates against any state action, whether by statute or otherwise, which denies to any person, on account of race or color, equal accommodation in public schools. This is well settled. 12 C. J. 1174, and cases therein cited. While a state may not deny to persons of different races equal accommodations in schools, it may deny them identical accommodations."

Again this court said, in the case of C., R. I. & P. Ry. Co. v. Lane, 69 Okla. 145, 170 Pac. 502:

"By the provisions, it is apparent that the Legislature imposed upon the counties, where separate schools were necessary, the burden of maintaining said schools, and provided for a tax levy upon all the property of the county, to support said separate schools."

So we come back to the system announced in the first part hereof, and epitomized, section 10321, C. O. S. 1921 (part of the Code of 1913), is a formation and change of school districts by the county superintendent. Section 10337, C. O. S. 1921, makes each district a municipal corporation. Section 10569, C. O. S. 1921, is the definition of separate school. Under this section, it is clear that the separate school may exist in the territorial limits of a school district, but the same is merely an adjunct of and part of the county government, and is a county burden, and the district board of the school district has nothing to do with it, either its government or its support.

Some confusion is sought to be injected into this scheme by the provisions of section 10322, C. O. S. 1921. This section is a mere remnant of the old scheme of having separate school districts for colored and whites, and the colored school board for colored schools and a white school board for white schools, and it has no meaning under the well-defined school system as now existing under the law of the state.

Since the Constitution and statutes provide that the state aid shall be apportioned among and between all the **several school districts** of the state, the separate school being a county burden, and an adjunct of the county government, there is no school district for a separate school, and it follows necessarily that the moneys being set apart for school districts are held, owned, and controlled by such as municipal corporations, through their duly elected boards, the county treasurer functioning as the treasurer of each common school district in his county, the same as if under statutory authority the district had elected its own treasurer.

This being the system, when the county treasurer receives from the state the moneys according to the scholastics in the county, and a certificate from the county superintendent as to the scholastics in each school district, including both white and colored, he must place it to the credit of the respective school districts, and he has no power to divert any part thereof to the general fund of the county, neither has the county any authority to use the same, and such fund so diverted is an appropriation of money by the county not belonging to the county, and it is liable therefor. It was so held by this court in all the above-cited cases, and the language of the statutes and Constitution is so plain it is not susceptible of interpretation. The writer, therefore, must dissent from all the contentions discussed or passed on in the opinion in the instant case.

Note.—See under (1) 35 Cyc. p. 819; 24 R. C. L. pp. 653, 654. (2) 35 Cyc. p. 825 (Anno). (3, 4) 35 Cyc. p. 827 (Anno).